Good morning, Your Honors. May it please the Court, I'm Paul Ward. I am the petitioner in this case as the next friend of the minor, Crystal Emma. The first issue I want to discuss is the fact that nothing in the record establishes what Detective Stout told Crystal about her right to counsel before she interviewed her. The record says that Crystal had trouble understanding her right to counsel as Detective Stout read it from the car. The rest of the record is Detective Stout says... Are you related to Crystal? No, I'm not. I was her State Court appointed attorney on appeal. Can I ask you a couple questions? Sure. How old is she now? She would be 22 or 23. I'm not sure exactly. And where's the adult boyfriend? He was convicted of first-degree murder. The jury did not sentence him to death, but I think he's doing a life without parole. He's certainly life without parole, I believe. Okay. Did he testify against her? No, he did not. And she was called twice. He was tried twice. The first trial hung and she was called in the first and second trial and did not testify. And what is the operable sentence that she received? She got a CYA, 25 years, and then she goes into state prison? Is that it? No. My understanding is that what was then the California Youth Authority can hold a minor until they reach the age of 25, at which point they are released. They're released? I believe so. You don't know? I do not know how that works. I handle the front end of the appeals. Yeah, but this is your client. Didn't she ask you, how long am I going to be in prison? It's my understanding that she will be released at this point. Well, that's my understanding, too, because I served on the Superior Court many, many, many, many, many, many years ago. But, you know, laws change, so that's why I ask. I don't believe they can hold anyone beyond age 25. Perhaps the Attorney General can. So then she would be released, is that correct? Yes, she would be released from the youth authority. But that's not the way the sentence reads. It has this bit about 56 years to life. Yeah. But that would be if she'd been an adult when she was tried. That's correct. The courts have to state what the corresponding adult sentence would be, even though the youth authority doesn't hold them beyond age 25. But if you read that, it sounds like she's going to be in there, you know, 56 years. Yes. As far as I know, that is not the case. Well, perhaps the government or the state can clarify that when they get up. I had a question about the point in the discussion where she said, I choose not to talk about it. Assuming that we were to conclude that she understood her rights and that she invoked her right to silence at that point, what statements would be included and excluded? I'm not sure if I'm making myself clear, but does that have the same practical effect as concluding that she was not properly Mirandized at the beginning? Yes. I presume some of her testimony that she gave, some of the statements she made to the officer before that she invoked her right to silence would still come in. But from the perspective of what was, in fact, harmful to her cause, would you – would it have the same effect? Well, I think it would have enough of an effect that she would have to go back to juvenile court and they would have to re-decide if there was sufficient evidence to convict her of the murders under the felony murder rule. But I don't think the Court has to get that far. I think her original – the original problem about her right to counsel is very clear, that Detective Stout told her something about her right to counsel. But the record doesn't show what. Well, that's what I was going to ask you. Where's the transcript of her waiver of her right to remain silent? That was done in the police car on the way from wherever she was arrested. Well, it starts at ER 54. There's a conversation. It says, when we were in the car, remember reading the rights. I'm going to read them again, and I'm going to ask you each time if you want. So it is in the transcript. Well, okay, yes, she does. But there again, when the detective gets to the right to counsel, she says, this is the one we talked about in the car. But he says, you have the right – I'm at 54, 55. You have the right to an attorney before and during questioning. Okay, okay. Yeah, well – Do you understand the rights I've just explained to you? Yes. Do you need me to explain that one again? No. Well, the problem is that that refers back to what went on in the car, in the police car on the way up. We don't know what Detective Stout said about that. Well, but that's not the part about appointing a lawyer. It's about the free of charge. But regardless of what he said then on this, there is a transcript where he goes through each of the aspects with her. Anyway, that's why I asked you about the invocation and what came before and what came after. There is this, but it all refers back to what happened originally in the car when Detective Stout read her Miranda rights off the card. And Detective Stout says, I believe she had trouble understanding her right to counsel. And then I explained it to her. And that's all that's on the record as far as what Crystal knew about her right to counsel. Remember, she's 12 years old. You have to show a knowing and intelligent waiver and all that. Now, where is that in the record? Well, I don't believe there is. Don't you know that you have to show a knowing and intelligent waiver? Yes. So where is it? The state has to prove that by preponderance of the evidence. And because of this gap, there is no evidence about how Detective Stout explained to Crystal her right to counsel. She's 12 years old, right? And the detective said she had trouble understanding this right, so I explained it to her further. But that doesn't give us any basis for assuming that Detective Stout read, explained something to Crystal that a 12-year-old could understand about her right to counsel. We already know that just straight off the Miranda card, she doesn't understand her right to counsel. She had trouble with it. She doesn't know what this is all about. She doesn't have any experience with the criminal justice system. She's 12 years old, never been in trouble before. So she doesn't understand that. Detective Stout says, well, I explained it to her. And that's all we know. But, you know, case law is full of instances where detectives minimize or try in some way to dissuade a witness, suspect, from lawyering up. And we have no reason to believe that Stout said anything in the way that a 12-year-old would understand about her right to counsel. What goes on? You know, when would the attorney show up? What would the attorney do during questioning? What would the attorney do after questioning? What does an attorney do for a 12-year-old? She has no way of knowing. All right. He has a minute left. Good morning. May it please the Court. Deputy Attorney General, excuse me, Steve Auding, on behalf of the Respondent. Every course which has examined this issue has concluded that Crystal M. knowingly waived her Miranda rights, that her confession was voluntary and not coerced, and that those State court determinations are not objectively unreasonable. And that is the rubric under which we must examine the present record. Yes. Where in the record did this young lady waive her right to counsel? At page 50. Where did she waive her right to remain silent? At page 55. Will you turn and read it to me? Okay. Do you understand? This is Detective Stout speaking. Do you understand the rights I have just explained to you? Yes. Do you need me to explain that once again? Or, excuse me, that one again? No. Now, what did we have? That waiver. Well, do we have what she said? She says she understands it. With these rights in mind, are you willing to talk to her? Where did she say I waived her right? With these rights in mind, as it continues, with these rights in mind, are you willing to talk to me? Yeah. Yeah, but where does you get a waiver? Did she sign a waiver? No. This was a verbal waiver, Your Honor. This was an oral waiver. She didn't sign anything. She did not sign anything. She didn't sign anything. The Constitution does not compel, does not require the police to obtain the written. No, but the police practice requires it, I think. That's not compelled by the United States Supreme Court. No, but that's just my opinion. Can you read to me what his explanation to her was to which she said, yeah, I understand? That, Your Honor, is referring to what transpired in the car. Yes. So this is very difficult for us to know really what she was saying she understood. Isn't that right? Your Honor, I would disagree respectfully. The ‑‑ Crystal Oren did not testify at the hearing. She could have testified, but she did not. We have here her statement that she ‑‑ Well, we can't hold that against her, can we? In the context of a Miranda invocation, Your Honor, where we are examining what she understood, she could have testified. The government has the burden of showing, telling us what the explanation was. And I haven't heard an explanation. Your Honor, respectfully, under Fair v. Michael C., which is the United States Supreme Court authority, again involving a juvenile, we would invoke that decision, which states that the ‑‑ that the suspect stated that they understood the rights and that nothing in the following course of the interrogation revealed that the suspect did not understand the rights. How old was that juvenile? I believe 16, Your Honor. Can I ask a question about the transcript, page ER158? Yes, Your Honor. Where after there had been a colloquy where the questioner said, I think you did it, and she said, me? And then, I think you need to tell me about it, tell me about it, I know you're afraid, et cetera. Tell me the story. She says, I can't. Okay. Is it too hard to talk about? Why can't you tell me? I don't know. I just choose not to talk about it. Now, why isn't that under any reasonable interpretation of Supreme Court precedent an invocation of the right to silence? I just choose not to talk about it. Your Honor, the state courts found that that was not an invocation of the right to silence, that it was instead a simple reluctance to speak about a certain subject matter. Now, again ‑‑ Well, the subject matter was the crime being investigated. Isn't that what ‑‑ I mean, I have great difficulty understanding how, in this respect, the California Court of Appeal opinion is reasonable. So I just ‑‑ I have difficulty when someone says, I choose not to talk about it, when they're being asked about the crime under investigation, how that's anything other than an invocation of the right to silence, and why they're doing it doesn't matter. So to say, well, why don't you want to talk, seems to me utterly irrelevant and improper. But there is a question lurking in this, and that is the same question I asked opposing counsel. Assuming that the initial waiver was proper, but that this was an invocation, and so that the things that came after would have to be excluded, what effect would that have on the outcome? Well, Your Honor, I would submit that were this Court to reach that conclusion, that the outcome would nonetheless be an affirmance. It should be ‑‑ excuse me. By that point, Crystal M. had already discussed this. This had gone on for 107 pages. At this point, she had already discussed enough facts to reveal her complicity in the murders. She had stated, among other things, that Jesse Crespin, the other perpetrator, did not leave her sight at any time. Then she posited a number of falsehoods, including the fact that he left her sight and then came back with a key, and that when they approached the residence, he already had the key, miraculously. Now, once again, to put yourself in the position of a trial judge in this matter, this is where they've broken down in front of a house, and yet she's maintaining that he just happened to have had the key to that house, and that he went over and they jumped in the Volvo and drove away. Clearly, Crystal M., by her statements as of this point in the record, and that would be by ER 158, she has already stated enough that's beyond a reasonable doubt implicated her in the burglary and murders of the Schaffers, even without the remainder of her statement. At this juncture, everything that she has said up until now, assuming that she invoked her right to silence at this point, a matter with which I would disagree if given the opportunity, even assuming that, though, she's already said enough to implicate herself in those murders, and therefore any error would be harmless. Supposedly, we're back to whether she waived her rights. And in the record, we have no understanding of what she was told that she was waiving. I think it's the government's burden to show exactly what was said and why she waived it. And this is against a background where she was detained for 11 hours and then questioned for 5 hours, a 12-year-old. It's very difficult for me to think that this Court could say that she waived her Miranda rights. Well, Your Honor, respectfully, at the time that she was being first interrogated, this was at the beginning of the interrogation, when she stated earlier what was in the car, the record does not reveal what was stated. All that we have is a statement by the detective that she explained that. Do you understand that, Crystal? Yes, I understand that. Would you like me to explain it further? I understand the record, and you understand the record. And your problem is, in my view, that we have no record of whether she was given an adequate Miranda warning that she then said she understood. And there's always some question whether a 12-year-old, in that context. Well, Your Honor, again, I would respectfully disagree. We have a record that she was read the Miranda rights verbatim and that she said she understood those. Well, you got the language that was read to her? Yes, Your Honor. Where? Where? We know that they said they read it to you. You have the right to remain silent, okay? Anything you say can be used against you in court. You have the right to an attorney before and during questioning, okay? And where is this? This is at page 54 of the interrogation. And where was she then? It was after they got out of the car? Yes, Your Honor. Okay. Okay? Okay. This is the one now they say, now they're talking about the right to counsel. This is the one we talked about in the car. If you cannot afford an attorney, one will be appointed for you by the court, free of charge, before questioning. Do you understand those rights? Yes. We have, and we have a compliance with Miranda. That's the waiver. Do you understand that? Yes. Do you need me to explain that? No. Okay. With these rights in mind, are you willing to talk to me? Yeah. That's the waiver right there. That complies with the constitutional requirements. And it cannot be said that the California courts were objectively unreasonable. Right there. No one has ever claimed that. Let me ask you this. When a minor is taken into custody, the officer shall advise the juvenile of her Miranda rights. You're saying that was done. Once the minor is in custody, the officer must notify the minor's parents immediately. And within one hour of being taken into custody, the minor shall be advised of the right to Additionally, the officer should either refer or release the minor or take the minor without unnecessary delay before a probation officer. The probation officer should also advise the minor and her parents of the minor's constitutional rights. Now, was all that done? No. No, Your Honor. Why not? I do not know why not, Your Honor. I do not know. If you had a 12-year-old daughter, would you expect that officers of the law would comply with the law? Yes, of course, Your Honor. Yeah. So they didn't do that. They did not do that. However, that does not render it constitutionally impermissible. Well, that makes me think that when they gave her her rights, maybe she didn't know what was going on either. Well, wait a minute. That would be a leap, Your Honor. Because to say that she says here on the record, I understand. I do not need you to explain this to me. Well, you know, it's all right. You think a 12-year-old girl understands all these things just by stating them? Well, Your Honor, no, I don't think just by stating them. But Fair v. Michael C. instructs us. Fair v. Michael C. You've got to have the parents there. You've got to notify them. You've got to get them to a probation officer who's there to make sure they're advised. So we put all those, and then it says here, well, anyway. But, Your Honor, no court in the nation of which I am aware, no court has held that the failure to notify the parents constitutes a constitutional violation. Why do we put that in there? Well, Your Honor, that is required. I mean, the police are required to obey the law. Absolutely, Your Honor. They didn't obey the law here. But that is not this Court's responsibility, with all respect. Well, it's not my responsibility. Your Honor, this Court is here to determine whether there was a constitutional violation. It is my responsibility. It is to enforce the Constitution of the United States, Your Honor. My oath requires me to see that justice is done and to enforce the ‑‑ I don't enforce the Constitution, to interpret the Constitution to the best of my ability. And it seems to me that that is a very important provision. That's in the Welfare and Institutions Code. There's a whole bunch of stuff there. And that's totally disregarded. That is a matter of state law, Your Honor. The question before us was were the California ‑‑ What difference does that make? Your Honor, we are here to determine under the ‑‑ under AEDPA, the Antiterrorism and Effective Death Penalty Act of 1996, whether the State courts were objectively unreasonable in reaching their conclusions that there were no constitutional violations here. Whether or not there was a State court violation is not before us. There was no constitutional violation. The record has shown on page ER54 and 55 that she knowingly and intelligently waived her rights. Her statements were in conformity with that understanding. And this is in conformity with Fair v. Michael C., which is the United States Supreme Court precedent, which we must follow. I can't say that she knowingly and intelligently waived her rights because they asked her if she understood it. She said yes. Then they didn't ask her. Are you willing to give those rights up? That's a waiver. Well, Your Honor, they did say, are you willing to talk to me? With these rights in mind. With these rights in mind, are you willing to talk to me? With these rights in mind, but I don't see where she's made a waiver. You just ‑‑ Well, she says, excuse me, she says, yeah. Okay. Is that yes or no? Yes. That's a waiver. The Constitution requires nothing else. With all respect, Your Honor, whether or not there's a violation of state law is not before us today. The question is whether or not the California courts were objectively unreasonable. I would submit that it cannot be said on this record that they were objectively unreasonable in concluding that there was a knowingly and intelligently waiver. Counsel, you've exceeded your time, but I do have a question that was asked of opposing counsel. Under the governing law, will this individual be released at age 25, notwithstanding that she ostensibly would have received 56 years to life? That is correct. The reason the state courts put the sentence of 56 years to life is because the defendant cannot be held longer than an adult could have been. And so that's why they determined what an adult otherwise would have been sentenced to. So if the sentence were three years, then she couldn't be held longer than three years even if she was much younger. Correct, Your Honor. Is that the sentence? I'm sorry? Read the sentence. Read the sentence to me. I don't have the remitter in front of me. But she'll be released at age 25? Yes, Your Honor. That's what you're saying? Yeah. Okay. Well, when the judge sentenced her, what did he say? Well, in accordance with state law. I read it in here somewhere. And unless I went to research it, which I didn't have the time to do last night as I read it, she's going to be in there 56 years. That is not my understanding, Your Honor. I don't think so. That's not my understanding. Fine. I'm overruling. Thank you very much. Well, I'll just emphasize it. Whatever Crystal said on page 54 of the transcript refers back to what she was told in the car. And there's no record of how Detective Stout explained the right to counsel to Crystal. Well, suppose he hadn't explained it at all and just said what was otherwise said on this record. That would be sufficient. If you saw this transcript without the phrase, this is the one we talked about in the car, everything else on pages 54 and 55, would you agree, ordinarily, would constitute Miranda warnings and a waiver of Miranda rights? I would say they do constitute standard Miranda warnings. I don't think there's an explicit waiver. You know, I waive these rights and I will talk to you. If this were an adult and it didn't have the phrase, this is the one we talked about in the car, isn't this rather standard waiver language with these rights in mind? Are you willing to talk to me? Yes. And it goes on from there. Would you be standing here arguing in the absence of this is the one we talked about in the car, would you be arguing that this is not a valid waiver? Well, actually, my argument about what she was told comes from the suppression hearing in juvenile court. You're not answering my question, though. I want to know what you think of what's on pages 54 and 55 in a standard case where it goes through all the different rights and the person says, do you understand? Yes. Do you need me to explain again? No. With these rights in mind, are you willing to talk to me? Yes. If that were an adult and we didn't have any other information about her understanding the rights, I would say yes, that's a waiver. Okay. So you're really relying solely on the fact that they discussed these rights even more beforehand to say that, therefore, the later waiver, when they're explained to her in the normal way, is invalid as a matter of law and that the California court is unreasonable to include it otherwise? Well, the law is that the government has to prove by preponderance of the evidence that these were knowing and intelligent waivers. Right. And the California court of appeal explained in some detail why the answer to that question, in their view, was yes. So we have to determine whether that was unreasonable of them, not just whether we would have come to a different conclusion. I understand. Why is that an unreasonable conclusion from this record? Because at that suppression hearing, the officer gets up and says, I read the standard Miranda rights to her. She had difficulty understanding her right to counsel. I explained it to her. Now, to build a record that shows beyond a preponderance of the evidence that Crystal had a clear understanding of that, the obvious question to the officer, well, officer, what exactly did you tell Crystal about the rights? That might have been better, but we're not here to figure out what's better. We're here to say that the California court was unreasonable in concluding that this record demonstrated a waiver by a preponderance of the evidence. I think when you have an explicit reference to a non-understanding of a right, that to say that that But it's followed by a discussion where she says, do you understand? Yes. Do you need me to explain that again? No. Well, again, that all depends on what was explained in the card. And without So you would have us presume that she was told something inaccurate and that the California court could not have concluded reasonably that she was told something accurate. I don't believe that there is, by a preponderance of the evidence, proof that she understood her rights. She explicitly says, I don't understand. And then the officer relates that Crystal did not understand. Followed by an explanation, followed by her saying, I do understand it Well, and I hate to keep repeating myself, but it depends on how the officer explained these rights to Crystal in the car before they got into the interrogation room. And I would say that given, as Justice Bregerson said, that the officer did not conform to the law, I see no reason for the court or any court to assume that the officer gave a full and complete explanation to Crystal at the time. I mean, if you read the transcript of the interrogation, nobody shows up. There's no parents. There's no attorney. There's no probation officer. Do you agree with opposing counsel that your client could have testified in support of suppression without otherwise jeopardizing her right to remain silent in the main proceeding? I have not thought about that question at all, and I would hate to give an answer off the top of my head. Any further questions? Well, you know, I have a page here. I think it's where you're questioning the officer, and you say, elaborate, please. And he says, on my Miranda card, on one side are the rights individually listed. On the flip side of that card are what I refer to as the waiver questions. Do you understand the rights I've just explained to you? And with those rights in mind, are you willing to speak with me? Question. Those are two waiver questions. Yes, sir. And it's your testimony today that you didn't ask her both of those waiver questions in the card. My testimony today is that I don't have specific recollection of asking her those waiver questions. Okay. Was there a discussion between yourself and my client about explaining to her what the right to remain silent meant? I recall explaining one of the rights to her in detail, but I don't think that was one. Are you referring to the right to counsel? Yes. I believe she had a problem understanding that, that the court, that should she not be able to afford an attorney, that the court would appoint one to her. Question. But you never clarified the right to remain silent. Answer. I have no specific recollection of clarifying that right. All right. Did you ever look at that card? No, I've never seen the card. I wasn't her trial counsel. I was her appellate counsel, so that's not in the record. That's not part of the record on appeals, so I didn't see it.
judges: Fletcher B. , Pregerson, Graber